UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09CV-742-H

IDY TALL                                                                                    PLAINTIFF

V.

UNITED PARCEL SERVICE CO.                                                    DEFENDANT

**MEMORANDUM OPINION**

Defendant, United Parcel Service, Inc. ("UPS"), has moved for summary judgment on two of Plaintiff Idy Tall's claims for retaliation and hostile work environment.[1] The Court has thoroughly reviewed the submissions of counsel as well as Plaintiff's full deposition in order to articulate the relevant evidence. This task was somewhat complicated by a lack of specificity and clarity as to the timing, frequency and content of the harassment and a determination as to which facts are properly considered.

The issues in this case are further complicated because Plaintiff and UPS had previously settled a lawsuit involving similar claims. After careful consideration, the Court has determined that even considering the prior statements or actions to demonstrate the racial or retaliatory nature of the harassment, Plaintiff's claims still fail.

I.

The relevant evidence is as follows.

In 2000, Plaintiff began working for UPS in Louisville, Kentucky, as an Instructor in the

---

[1] Plaintiff brings claims under the Kentucky Civil Rights Act.

Aircraft Maintenance Training Department – a position he holds today. He was the first African-American instructor in this department. Throughout all relevant times, he was the only African-American instructor in the department. In 2005, UPS had temporarily transferred him to a position on its Audit Team for two years. In 2007, Plaintiff filed a lawsuit against UPS alleging discrimination because of his race and/or national origin. Plaintiff alleged that UPS denied him the opportunity to teach classes on modern aircraft, thereby inhibiting Plaintiff's career advancement. He also alleged a hostile work environment at UPS based on several specific comments related to his race and/or national origin.

UPS denied the claims in Plaintiff's 2007 lawsuit. In December 2008, after a period of discovery and a mediation, Plaintiff and UPS settled the case. Plaintiff signed a valid waiver of all claims asserted or assertable against UPS. Subsequently, the Court dismissed the case with prejudice.

Several months later, UPS requested that Plaintiff take the position of Relief Supervisor, and he seemed to agree to it. During his testimony in this case, Plaintiff says that he agreed under duress, and because he was told the transfer was temporary. In this position, he no longer taught classes for UPS. Instead, he filled in for other supervisors in various locations across the country, when they traveled to Louisville, Kentucky for training. He began his new job on April 12, 2009.

After starting the new job, Plaintiff heard rumors that the training manager, Kirk Carter, had told some other Instructors that Plaintiff was no longer an Instructor. The employees were evidently concerned that the Relief Supervisor position would rotate among the department, but Mr. Carter informed them that Plaintiff was the only one who would be performing the duties of

Relief Supervisor. Based on this information, Plaintiff says that it was a job "no one wanted."

Prior to his transfer to the Relief Supervisor position, Plaintiff had been working on the A-300 FAM.[2] While the A-300 is one of the modern aircraft Plaintiff wanted to teach pre-settlement, Plaintiff feels his assignment to A-300 FAM rather than A-300 Avionics limited his appeal to industry leaders and prospective employers. Carter gave the A-300 Avionics position to Steve York, even though Plaintiff had experience in Avionics. It appears that these assignments occurred prior to the 2008 settlement. Plaintiff was training for A-300 Avionics when he filed this lawsuit, though at the time of his deposition he was not assigned to teach any classes.[3]

Though the training process to teach on a particular aircraft, referred to in the industry as "spooling up," can take between 18 months and three years, Mr. Carter gave Plaintiff a mere week in one instance and six months in another to learn the job. Plaintiff says that this was an attempt to frustrate the objective of the settlement agreement.[4] Plaintiff feels that moving him to the relief supervisor position had the added detrimental effect of denying him the opportunity to become proficient on the A-300, again in violation of the objective of the settlement agreement.

On May 29, 2009, Plaintiff sent a letter to Jaime Gonzalez, in which he complained for the first time about being transferred to the Relief Supervisor position. He closed with the

---

[2]Plaintiff explains that his colleagues felt he was assigned to this aircraft because of his previous lawsuit claiming racial discrimination and, consequently, were upset and wanted him to fail.

[3]Joel Bales, Carter's replacement, decided to remove Plaintiff from the A-300 team because of personality conflicts. Bales planned to put Plaintiff on the next new aircraft at UPS.

[4]Plaintiff makes much of Defendant's alleged violation of the spirit or objective of the settlement agreement, in essence a breach of contract claim. However, Plaintiff has made no such claim. While the actions and statements that allegedly evidence such a breach of the settlement are relevant and were considered by this Court to determine whether Plaintiff was subject to retaliation or a hostile work environment, there is no reason to consider whether there was any sort of breach of the settlement agreement.

statement that he was "no plantation Negro." Within a few weeks of receiving this complaint, UPS transferred Plaintiff to his Instructor position, where he has worked ever since.

Mr. Carter, as the Training Center Manager, had the primary responsibility for making training instructor assignments. He decided to reassign Plaintiff to the Relief Supervisor position. Plaintiff says that a conversation in August 2009 shows Mr. Carter's racial animus. In that conversation, Mr. Carter assigned Steve York, who allegedly showed racial disdain for Plaintiff, to monitor his work.

Other post-settlement incidents or actions which Plaintiff says show a racially hostile or retaliatory environment, include:

- Joel Bales said that he preferred to work with other instructors who were smarter than Plaintiff more than once. In January 2009, Bales also stated that if he were the training manager, he would know how to take care of someone who had sued him for discrimination. Bales (who is allegedly Plaintiff's "nemesis") was appointed to replace Kirk Carter when Mr. Carter retired.

- Fellow instructors Ed Davenport and Steve York unsuccessfully tried to suggest that Plaintiff was lowering the quality of the department in an employee review survey .

- Steve York made negative comments about Plaintiff to two of Plaintiff's students; these employees were offended by the comments and reported them to their superior and, eventually, to Plaintiff. During Plaintiff's class, York repeatedly objected to the accuracy of the information Plaintiff presented. Mr. Carter assigned York to monitor Plaintiff's work and required Plaintiff to sit in on York's class.

- Plaintiff was required to make practice presentations of his class material to his fellow instructors for evaluation; such presentations, according to Plaintiff, are required only for entry-level instructors.

- Plaintiff was excluded from training instructor meetings and collegial activities, which made him feel unwelcome and unwanted. Fellow A-300 instructors excluded Plaintiff from classes, trips, or other group work but then reported to Carter that Plaintiff was not a "team player."

4

- Brad Schwandt, who was one of Plaintiff's supervisors and may have held that position for a brief time following settlement, would meet with other instructors to discuss career objectives, but did not offer to meet with Plaintiff. Schwandt also invited all other CAP instructors besides Plaintiff to work on a project.

- Kim Richardson asked Plaintiff if he was responsible for Brad Schwandt leaving the position of division manager. Gene Goodwin later made a couple of comments about Plaintiff's "voodoo doll" saving him, indicating that had Schwandt not left, he was going to remove Plaintiff from his job.

- Plaintiff has been accused of being tardy, being asleep at his desk, and not carrying his work load (though not disciplined for any of these offenses).

- Plaintiff claims he was never provided with similar training opportunities as the other instructors. Furthermore, Carter scheduled A-300 FAM classes at the same time as an Avionics 2 class Carter asked Plaintiff to teach, thereby interfering with his A-300 preparation. Once Plaintiff was teaching A-300 FAM, Carter informed Plaintiff that he had heard his classes were not going well.

UPS has an anti-harassment policy that it distributes to all employees. Plaintiff apparently reported alleged harassment on, at most, four occasions; in March of 2009, Plaintiff first reported York and Davenport's attempt to implicate Plaintiff as a reason for quality issues in the department to Mr. Carter, who responded that these were opinions, not harassment. Plaintiff then reported the incident to Gonzalez and found his response appropriate and effective. In another instance, Plaintiff reported to Carter that York was sabotaging his class by objecting to the accuracy of Plaintiff's teaching and fraternizing with students. Carter eventually sat in on the class and, consequently, requested Plaintiff make a practice presentation to fellow instructors. After Plaintiff repeated his protests, Carter brought Plaintiff's complaints to the attention of Bill Byrley. It is unclear to the Court how UPS responded at this point, but Plaintiff claims Byrley "found proof of harassment." Finally, Plaintiff reported several incidents of alleged harassment in his letter to Jamie Gonzalez complaining about being moved to the Relief Supervisor position. In response, Gonzalez and Byrley met with Plaintiff and acknowledged they were not fully

5

aware of some of Plaintiff's complaints. They decided to put Plaintiff back on A-300, but this time on Avionics rather than FAM.

In August 2009, Plaintiff filed the present lawsuit. This time, Plaintiff alleged that he was subjected to retaliation for his previous lawsuit and that he suffered unequal terms and conditions of employment based on his race. Ten months later, Plaintiff filed another lawsuit, which was consolidated with the present one, in which he alleged that he suffered another hostile work environment based on his race.

## II.

Considering a motion for summary judgment, the Court views all facts and makes all inferences in a manner most favorable to the non-moving party, in this case Plaintiff. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 - 588 (1986) (quoting *United States v. Diebold, Inc. V.* 369 U.S. 654, 655 (1962)). While the moving party must demonstrate that no genuine issue of material fact exists, in response, the non-moving party must move beyond the pleadings and present evidence in support of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

## III.

Plaintiff argues two related theories of retaliatory discrimination, one based upon an adverse action and another based upon harassment. In this Section, the Court will focus on the adverse action claim.

To analyze a retaliation claim, courts utilize the familiar burden-shifting framework of

6

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 - 04 (1973). Plaintiff has the initial burden to establish a *prima facie* case of retaliation by showing (1) he engaged in activity protected by Title VII; (2) his exercise of protected rights was known to UPS; (3) UPS thereafter took adverse employment action against Plaintiff, or Plaintiff was subjected to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

The parties agree that Plaintiff easily satisfies the first two elements of the *prima facie* case. However, the first theory of retaliatory discrimination requires establishing an adverse employment action. To satisfy this element, Plaintiff cites his transfer to the Relief Supervisor Position in April 2009. Though Plaintiff did agree to the transfer; he argues he accepted the position under duress. Other than his own testimony, Plaintiff has presented no such evidence. *Cf. Fisher v. Forestwood Co., Inc.,* 525 F.3d 972, 980 - 81 (10th Cir. 2008) (stating that to find Plaintiff's resignation was not voluntary, Plaintiff has the substantial burden of showing that the "working conditions were so intolerable that he was forced to quit."). Plaintiff's transfer to the relief supervisor position did not result in a loss of pay or benefits. *See Birone v. Indian River School*, No. 97-3212, 1998 WL 199791, * 4 (6th Cir. April 15, 1998)(stating that an adverse employment action constituting retaliation can include "a loss in pay or benefits, a detrimental change in responsibilities, a negative change in the terms and conditions of employment, or some such actual and unfavorable change in job status.") (unpublished disposition). Moreover, as soon as he wrote a letter complaining of the transfer, UPS returned Plaintiff to his preferred position of instructor. *See Bowman v. Shawnee State University,* 220 F.3d 456, 461 (6th Cir.

7

2000) (finding that the plaintiff "did not suffer an adverse employment action by the very temporary loss of his position.").

The Court concludes that as a matter of law these circumstances do not demonstrate an adverse employment action. Even assuming that his transfer was involuntary, the new job contained none of the negative terms and conditions that would meet the standard of an adverse action.[5]

IV.

To prevail on his hostile work environment claim, Plaintiff must show that (1) he "is a member of a protected class," (2) he "was subjected to unwelcome racial [or retaliatory] harassment, (3) the harassment was race [or retaliation] based, (4) the harassment unreasonably interfered with his work performance by creating an environment that was intimidating, hostile or offensive; and (5) employer liability." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). The key issues raised here are whether the evidence is sufficient for a jury to find severe or pervasive harassment and a causal connection between the harassment and Plaintiff's previous lawsuit or race.[6] The Court must confront these issues in Plaintiff's hostile work environment claim based on race and retaliation.

A.

As to element three, while none of Defendant's statements or actions after December

---

[5] The parties did not address the original claim that Plaintiff suffered unequal terms and conditions of employment. None of the discovery develops a case for unequal terms and conditions based upon race. The absence of proof concerning an adverse job action leaves such a claim without a potential foundation.

[6] Although Defendant has vigorously disputed that Plaintiff has demonstrated element five, employer liability, the Court has determined summary judgment is appropriate based on factor four alone. Therefore, for the purposes of this memorandum, the Court will assume Plaintiff has satisfied this element of his prima facie case.

2008 directly implicate race or national origin, some pre-settlement statements do implicate race or national origin.[7] Only a January 2009 statement by Joel Bales and pre-settlement statements directly implicate retaliation. However, "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, []he would not have been the object of harassment." *Id.* at 706. Furthermore, Plaintiff argues that societal attitudes evidence the racial animus present in certain statements said to or about Plaintiff, specifically, statements about Plaintiff's intelligence and voodoo dolls.

The Sixth Circuit's decision in *Clay* presents a good guide for this Court. In that case, one plaintiff was the only African-American employee within her group for a period of time; she presented affidavits demonstrating that she was "singled . . . out and castigated . . . for engaging in behaviors in which her white counterparts engaged with impunity." *Id.* at 706. The Sixth Circuit found that the plaintiff "created an inference, sufficient to survive summary judgment, that race was the motivating reason" for the disparate treatment. *Id.* At 707. Here, Plaintiff attempts to make a similar showing as to race.

Plaintiff was the only Instructor moved to the undesirable Relief Supervisor Position. Despite his experience in Avionics, Plaintiff was assigned to A-300 FAM rather than A-300 Avionics. Plaintiff, unlike his colleagues, was not given sufficient time to train to teach new classes. His colleagues tried to single out Plaintiff as decreasing the quality of the department in an employee review survey. Plaintiff was required to make presentations to his colleagues even

---

[7]For instance, Plaintiff was told that he could not be an instructor because of his accent, that he would do well in Africa with his work experience, and that he could contaminate colleagues with AIDS after returning from a trip to Africa.

9

though this is typically only required of new instructors. Steve York was assigned to monitor Plaintiff's work and Plaintiff was told to sit in on York's class. Plaintiff was excluded from meetings and collegial activities. All of these items are neutral as to race or retaliation.

This is a very thin case. Given some pre and post settlement statements implicating Plaintiff's race or national origin, evidence that Plaintiff was treated differently than his white colleagues, the timing after Plaintiff's first claim, and a few statements about the previous lawsuit,[8] a jury might infer that some of Defendant's actions were based on race or retaliation.

B.

Plaintiff's retaliatory and racial harassment claims each require a showing that Defendant's acts were severe or pervasive. *See Burlington Indus. Inc. v. Ellerth*, 524 U.S. 754, 2265 (1998) (stating that a plaintiff must show that the conduct was severe or pervasive for a hostile work environment claim) and *Morris,* 201 F.3d at 792 (stating that an element of retaliatory harassment is that it must be severe or pervasive). The Court must examine under the totality of the circumstances "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993)); *also see Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (describing that the court should consider the totality of the circumstances). "[T]he workplace must be permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or

---

[8]Plaintiff reports the following links to his previous lawsuit: Carter yelled at Plaintiff that he was not a racist when he first learned of the lawsuit; Carter made comments about Plaintiff's salary which was adjusted in the settlement of the previous lawsuit; Joel Bales commented that he would know what to do with someone who had filed a suit for discrimination.

10

pervasive to alter the conditions of employment." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65-67 (1986)). The harassment must be both objectively and subjectively severe or pervasive. *Abeita v. Transam. Mailings, Inc.,* 159 F.3d 246, 251 (6th Cir. 1998). The events which Plaintiff describes fall short of this standard.

1.

Here, none of the instances of alleged harassment were particularly severe. Plaintiff has made no allegations of harassment with any sort of physical component, either directly or indirectly. In racial harassment cases, courts have found severe or pervasive harassment in the presence of "racial slurs, demeaning jokes and inflammatory graffiti." *Jordan v. City of Cleveland*, 464 F.3d 584, 598 (6th Cir. 2006). Plaintiff does not allege any harassment that was explicitly demeaning or graphic. Furthermore, several of the harassing statements were not made directly to Plaintiff (such as his coworkers' attempt to attribute low quality in the department to Plaintiff and York's comments about Plaintiff to two other employees). While comments need not be directed at Plaintiff to be considered in the hostile work environment analysis, such comments are considered less severe. *Abeita,* 159 F.3d at 251.

Plaintiff focuses his attention upon several employment assignments and conditions which he says created an environment of harassment. He suggests that his exclusion from work-related meetings and activities, increased scrutiny of Plaintiff's work, insufficient time to prepare for teaching a new class, accusations of falling asleep, being tardy or not carrying his work load, and Plaintiff's temporary transfer to the Relief Supervisor position, all contributed to create a hostile work environment. These actions fall in the category of utterances that may be

subjectively offensive to Plaintiff, but are not usually actionable. *See Harris*, 510 U.S. at 21. Compare, *Jordan*, 464 F.3d at 598.

The Sixth Circuit has found severe or pervasive harassment which included employee isolation and assignment to additional duties due to his race. *Jordan*, 464 F.3d 584. Plaintiff complains about a similar isolation and also reports other requirements that he considered additional duties. Our case is nothing like *Jordan*. In *Jordan,* the isolation was accompanied by severe racial comments, foreclosure of opportunities to serve in an officer's capacity with the increased pay, and disparate discipline, among others. *Id*.

The Sixth Circuit has also found sufficiently severe or pervasive harassment to survive summary judgment where an employee is forced to take a particular shift, denied overtime and a break, not allowed to sit at a particular place at work, and found to be the only employee to not have a key. *Williams*, 187 F.3d 553. However, in *Williams,* that harassment affected work conditions in a very tangible way and was accompanied by vulgar, personal comments and harassment that was physical in nature. *Id.* Our case is much more like *Clay*, where defendants' offensive actions and unappealing work assignments were not accompanied by vulgar comments, formal disciplinary action, or tangibly disparate work conditions. *Clay*, 501 F.3d at 707-08 (affirming the district court's grant of motion for summary judgment on Moss' claim of a hostile work environment).

In sum, the evidence here does not come close to showing some racial or retaliatory harassment. The allegations of harassment here are not severe when compared to other Sixth Circuit cases.

2.

This Court must also consider the frequency of harassing statements. Plaintiff claims between three and five harassing statements prior to filing of this lawsuit. Some of this verbal harassment was repetitive. Nevertheless, Plaintiff claims that the harassment was so pervasive he could have gone to "H.R. every single day."

The Sixth Circuit has "reversed a grant of summary judgment in a hostile-work-environment claim after finding that the victim's assertion that the harasser's sexual comments were 'ongoing,' 'commonplace,' and 'continuing' was sufficient to survive summary judgment on the severe or pervasive test . . .[and] noted that when a victim makes allegations of ongoing harassment, the 'inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts.'" *Hawkins,* 517 F.3d at 334 (quoting *Abeita v. Transam Mailings, Inc*., 159 F.3d 246, 252 (6th Cir. 1998)). Here, Steve York's comments appear to have occurred during Plaintiff's classes or presentations. The allegedly harassing conduct was limited to these periodic meetings and the "verbal conduct was not objectively hostile or abusive as a matter of law." *Abeita*, 159 F.3d at 251 (discussing *Black v. Zaring Homes, Inc*., 104 F.3d 822 (6th Cir. 1997)). While Plaintiff suggests other employees made repeated comments, on further questioning in his deposition, Plaintiff concluded these other comments were made a couple of times.

Consequently, the Court cannot conclude that the evidence here does meet the minimum standard for severe or pervasive harassment which the Sixth Circuit has established.

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record